AO 241 (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| United States District Court | District | EASTERN DISTRICT |
|---|---|---|
| Name | Prisoner No. | Case No. |
| Joseph Hathorn Nuccio | G - 15270 | |
| Place of Confinement | | |
| High Desert State Prison In Lassen County, CA | 2:10-CV-2652 KJN (HC) | |

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| Joseph Hathorn Nuccio | v. M. D. McDonald, Warden |

The Attorney General of the State of: California.
Jerry Brown Jr.

## PETITION

1. Name and location of court which entered the judgment of conviction under attack  San Joaquin County
Superior Court,   In Stockton California

2. Date of judgment of conviction   5 - 6 - 2008

3. Length of sentence   26 years to Life

4. Nature of offense involved (all counts) 1st Degree Murder

_____

_____

_____

5. What was your plea? (Check one)
(a) Not guilty       ☒
(b) Guilty       ☐
(c) Nolo contendere       ☐
If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

_____

_____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
(a) Jury       ☒
(b) Judge only       ☐

7. Did you testify at the trial?
Yes ☐   No ☒

8. Did you appeal from the judgment of conviction?
Yes ☒   No ☐

**FILED**

SEP 29 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

(2)

AO 241 (Rev 5/85)

9. If you did appeal, answer the following:

(a) Name of court   California Court of Appeal

(b) Result   Partially granted

(c) Date of result and citation, if known   10 - 26 - 2009

(d) Grounds raised   Improper prison prior enhancement. This was overturned.

Violation of 5th, 6th & 14th Amendment rights of Due Process

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court   California Supreme Court

(2) Result   Denied without a decision on the merits.

(3) Date of result and citation, if known   1 - 13 - 2010

(4) Grounds raised   Violation of petitioner's 5th, 6th & 14th amendment rights to

Due Process i.e., failure to enforce the compulsory process.

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court

(2) Result

(3) Date of result and citation, if known

(4) Grounds raised

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☐  No ☐

11. If your answer to 10 was "yes," give the following information:
(a) (1) Name of court

(2) Nature of proceeding

(3) Grounds raised

(3)

AO 241 (Rev 6/86)

_____

_____

_____

_____

    (4)  Did you receive an evidentiary hearing on your petition, application or motion?

        Yes ☐  No ☐

    (5)  Result _____

    (6)  Date of result _____

  (b)  As to any second petition, application or motion give the same information.

    (1)  Name of court _____

    (2)  Nature of proceeding _____

_____

    (3)  Grounds raised _____

_____

_____

_____

_____

_____

    (4)  Did you receive an evidentiary hearing on your petition, application or motion?

        Yes ☐  No ☐

    (5)  Result _____

    (6)  Date of result _____

  (c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?

    (1)  First petition, etc.      Yes ☐   No ☐

    (2)  Second petition,       Yes ☐   No ☐

  (d)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

_____

_____

_____

_____

12.  State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.

    CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241 (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(I) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one: Violation of Petitioner's 5th, 6th and 14th ammendment rights to enforce a bench warrent prevented a fair trial.

Supporting FACTS (state *briefly* without citing cases or law) For the purposes of this [writ], petitioner adopts the statement of case and facts in the opinion of the Court of Appeal (slip opin., pp 2-4) with the following exception:   In its opinion, the Court of Appeal erroneously stated that an eyewitnesstestified he saw the victim on the "night" of the murder, talking to a man who looked like defendant. (People V. Nuccio, slip opin., p.2.) That is incorrect.   Contd...

B. Ground two:

Supporting FACTS (state *briefly* without citing cases or law):

AO 241 (Rev. 5/85)

C. Ground three: _____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

D. Ground four: _____

Supporting FACTS (state *briefly* without citing cases or law): _____

_____

_____

_____

_____

_____

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: _____

_____

_____

_____

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐  No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing   Jeffrey Silvia,   3439 Brookside Road, ste. 205,

Stockton CA 95219

(b) At arraignment and plea   Jeffrey Silvia,   3439 Brookside Road, ste. 205,

Stockton CA 95219

AO 241 (Rev. 5/85)

(c) At trial  Jeffrey Silvia,  3439 Brookside Road ste. 205,

Stockton CA 95219

(d) At sentencing  Jeffrey Silvia,  3439 Brookside Road ste. 205,

Stockton CA 95219

(e) On appeal  Marcia R. Clark,  23679 Calabassas Rd. #355,

Calabassas CA 91302

(f) In any post-conviction proceeding  Retrial Motion, Jeffrey Silvia, 3439 Bookside

Road ste. 205, Stockton CA 95219

(g) On appeal from any adverse ruling in a post-conviction proceeding  Marcia R. Clark, 23579

Calabassas Rd. #355, Calabassas CA 91302

16.  Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
Yes ☐ No ☒

17.  Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
Yes ☐ No ☒
(a)  If so, give name and location of court which imposed sentence to be served in the future: _____

_____

(b)  Give date and length of the above sentence: _____

_____

(c)  Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
Yes ☐ No ☐

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed

9-4-2010
(date)

_____
Signature of Petitioner

1. Joseph Hathorn Nuccio
    CDCR#: G - 15270
2. High Desert State Prison
    p o box 3030
3. Susanville, CA 96127
                In Pro-Per
4.
5.
6.
7.
8.                      UNITED STATES DISTRICT COURT
(.                    EASTERN DISTRICT OF CALIFORNIA
10. Joseph Hathorn Nuccio,        )   Case No. _____
                                  )
11.          Petitioner,          )   MEMORANDUM OF POINTS AND
                                  )   AUTHORITIES IN SUPPORT OF
12.     v.                        )   PETITIONER''S PETITION FOR WRIT
                                  )   OF HABEAS CORPUS
13. Mike McDonald, Warden,        )
                                  )
14.          Respondent,          )
                                  )
15. _____)

16.      Petitioner, Joseph Hathorn Nuccio, submits the attached Memorandum

17. of Points and Authorities in support of his petition for Writ of Habeas Corpus.

18. Dated:  9-4-2010

19.

20.

21.

22.                              Respectfully submitted,

23.

24.                              Joseph Hathorn Nuccio
                                 Petitioner

25.

26.

27.

28.

29.

## TABLE OF CONTENTS

PAGE

STATEMENT OF CASE AND FACTS . . . . . . . 1

SUMMERY OF ARGUEMENT . . . . . . . 1

ARGUEMENT

1.   THE TRIAL COURT'S FAILURE TO ASSIST COUNSEL IN THE
     EXECUTION OF THE BENCH WARRENT FOR A CRITICAL DEFENSE
     WITNESS, OR TO ENFORCE ITS OWN ORDER THAT THE PROSECUTION
     DO, VIOLATED THE APPEALANT'S RIGHTS TO DUE PROCESS,
     COMPULSORY PROCESS AND A FAIR TRIAL UNDER THE FIFTH,
     SIXTH, AND FOURTEENTH AMENDMENTS . . . . 3

     A.   Introduction . . . . . . 3

     B.   Proceedings below . . . . . 4

     C.   The prosecution was Required to make Good Faith
          Efforts to Execute the Bench Warrents for Terry
          and Tammy Sprinkle . . . . . 6

          1.   Misconduct is Shown Here . . . 9

          2.   The testimony of Sprinkle was both Material
               and Favorable . . . . . 12

     D.   The Trial Court had a Duty to enforce its Own
          Ruling and to Provide Assistance to Counsel to
          Achieve the Execution of the Bench Warrent . 16

     E.   The Court Of Appeal Opinion . . . . 17

CONCLUSION . . . . . . . . . 23

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Brady* v. *Maryland* (1963) 373 U.S. 83 .......................................................... 15

*United States v. Dring* (9th Cir. 1991) 930 F.2d 681 ............................. **15,22**

*United States v. Valenzuela-Bernal* (1982) 458 U.S. 858 [73 L.Ed.2d
1193, 1202; 102 S.Ct. 3440]............................................................. **7,8,15,22**

*Washington* v. *Texas* (1967) 388 U.S. 14 [18 L. Ed. 2d 1019; 87S. Ct.
1920]. .................................................................................................... 7

## STATE CASES

*People v. DePriest* (2007) 42 Cal. 4th 1 ................................................. **..**   **20**

*People v. Harris* (2005) 37 Cal. 4th 310 ........................................................ **20**

*In re Martin* (1987) 44 Cal. 3d 1 ...........................................**7, 8, 9, 15,22**

*People v. Coffman and Marlow* (2004) 34 Cal. 4th 1 ............................. **7, 15**

*People v. Schroeder* (1991) 227 Cal. App. 3d 784................................... **16**

*People v. Valencia* (1990) 218 Cal. App. 3d 808............................... **8, 9, 11**

## CONSTITUTIONS

United States Constitution
  Fifth Amendment...................................................................... **1, 2, 3, 8**
  Sixth Amendment ............................................................. **1, 2, 3, 7, 8**
  Fourteenth Amendment ...............................................................**1, 2, 3**

California Constitution
  Article One, section **15** ............................................................................ 7

**STATUTES**

Penal Code

    section 667.5, subdivision (b)  .   .   .   .   .   .   .   .   1

    section 830  .   .   .   .   .   .   .   .   .   .   .   10

Evidence Code

    section 1235  .   .   .   .   .   .   .   .   .   .   .   23

    section 1291  .   .   .   .   .   .   .   .   .   .   .   19

Code of Civil Procedure

    section 1993, subdivision (a)(1)  .   .   .   .   .   .   .11,18

1.                    STATEMENT OF THE CASE AND FACTS CONTD.

2. The witness testified that he saw the victim with someone who looked
3. like the defendant in the"morning" on September 25, 2001. The murder
4. did not occour until after 1 a.m. the following morning, September
5. 26, 2001. (1 R.T. 289-292; 2 R.T. 303, 330, 390-392, 404.)

6.                         SUMMARY OF  ARGUMENT

7.       Petitioner was convicted after a jury trial of first degree
8. murder with the use of a knife. The trial Court also sentenced
9. petitioner to one year based upon a prior conviction allegation
10. pursuant to Penal Code1 667.5, subdivision (b). Petitioner received
11. a total sentence of 27 years to life in state prison.

12.       Before the Court of Appeal, petitioner argued that his fifth,
13. sixth, and fourteenth amendment rights to due process, compulsory
14. process and a fair trial were violated when the prosecution agreed
15. to assist counsel with the execution of a bench warrent for a critical
16. defense witness, as ordered by the trial court, but did little to
17. comply with that order. Counsel had properly served the witnesses
18. and secured a bench warrant for their arrest, but did not have the
19. power to execute the warrants without the assistance of law
20. enforcement. Counsel, who had relied upon the promise of that
21. assistance, was misled into believing that the witness would be
22. produced. When the prosecution failed to execute the bench warrants,
23. counsel brought this to the court's attention, but the trial court
24. failed to enforce its order, and thereby deprived petitioner of a
25. witness who was critical to the third party culpability theory,
26. which was the entire defense. Petitioner thus argued that the trial
27. -------

28. 1 All future references are to the Penal Code unless otherwise
29. stated.

                                  1

1.  court had a duty to ensure that the bench warrent was executed to
2.  obtain the attendance of a critical defense witness, the prosecution
3.  made little effort to honor the court's order that it do so, and
4.  that the trial couts failure to enforce its own order violated
5.  petitioner's rights to compulsory process, due process, and a fair
6.  trial under the fifth, sixth, and fourteenth amandments. In addition
7.  petitioner argued that he was improperly sentenced on the prior
8.  conviction allegation because he never properly admitted that
9.  prior conviction.
10.     The Court of Appeal held that the prosecution did comply with
11.  the trial court's order and did not mislead defense counsel as to
12.  the efforts made to execute the bench warrant. The Court of Appeal
13.  also held that there was no violation of petitioner's right to
14.  compulsory process because the witness had indicated that he would
15.  never appear at trial. Lastly, the court held that since the
16.  witness's testimony was largely excluded, the witness's presence
17.  at trial would not have changed the outcome. (people v. Nuccio,
18.  supra, slip opin. pp. 5, 9-14.)
19.     With regard to the prior conviction allegation, the Court of
20.  Appeal agreed with petitioner that the trial court erred in
21.  sentencing petitioner on that allegation, because it had never been
22.  proven, but was merely the subject of a stipulation that failed to
23.  qualify as an admission. Accordingly, the Court of Appeal reversed
24.  the true finding and vacated the sentence as to that allegation,.
25.  (People v. Nuccio, supra, slip opin. pp. 15-21.)
26.   For the following reasons, this court should grant review of the
27.  issue adressed by petitioner.

2

ARGUEMENT

THE TRIAL COURT'S FAILURE TO ASSIST IN THE EXECUTION OF
THE BENCH WARRENT FOR A CRITICAL DEFENSE WITNESS, OR TO
ENFORCE ITS OWN ORDER THAT THE PROSECUTION DO, VIOLATED
PETITIONER'S RIGHTS TO DUE PROCESS, COMPULSORY PROCESS,
AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH
AMENDMENTS.

1.      A. Introduction

2.          Within the first 48 hours of the homicide of Zunino, the

3.      police had fouused their investigation on Terry Sprinkle, a violent ex felon

4.      who drove a white Bronco that fit the description of the car Zunino was last

5.      seen entering before her death.  Counsel made it known long before trial that

6.      he intended to pursue the theory of third party culpability that centered on

7.      Sprinkle as the killer.  To that end, counsel served a subpoena on Sprinkle

8.      and his wife.  At the time he was served, Sprinkle declared that he would not

9.      attend court, and true to his word, when he was due to appear in September of

10.     2007, nsither he nor his wife showed. A bench warrent was issued for both

11.     of them,

12.         During pretrial motions, the prosecution opposed the admission of

13.     Sprinkle's testimony, but the trial court ruled that, with limitations, it

14.     would be admitted.  Counsel then advised the court that he needed the assistance

15.     of law enforcement to execute the outstanding bench warrent for Sprinkle.

16.     Counsel knew where Sprinkle was located in San Jose and he had provided the

17.     adress to the prosecution.  The court then requested that the prosecution have

18.     the San Jose Police Department apprehend Sprinkle, and the prosecution

19.     agreed to do so.  However, when counsel later inquired what had been done to

20.     bring in the witnesses, the prosecution asserted that he could not ask another

21.     police agency for help, and that counsel should issue a new subpoena.

22.     The prosecution offered no authority fo the position that a new subpoena was

1.  required, and it never made any effort to show what had been done to execute

2.  the bench warrent.

3.      Terry Sprinkle was never produced at trial.  The prosecution's willful

4.  refusal to assist in the execution of the bench warrent -m a task that could

5.   only be accomplished by law enforcement - deprived petitioner of the right to

6.  due process and the right to compell the attendance of witnesses.  Accordingly,

7.  petitioner did not reccive a fair trial and his conviction must be reversed.

8.      **B. Proceedings below**

9.      Defense counsel stated his intention months before the start of trial to

10. present a third party culpability defense that would focus on the initial suspect

11. who was detained by the police in this case, Terry Sprinkle. (1 C. T. 203, 270.)

12. The prosecution filed a motion in limine to preclude Sprinkle's testimony, but

13. the trial court ruled that Sprinkle could testify within certain perameters.

14. (1 R.T. 105-125.)

15.     Counsel served Sprinkle and his wife with subpoenas to appear for trial,

16. which was set for September 17, 2007, but the prosecution requested a continuance.

17. (1C.T.214.) The matter was then trailed to September 20, 2007, and all witnesses

18. were ordered to appear on that date. (1 C.T.225.) Terry Sprinkle and his wife,

19. Tammy did not appaer as ordered on September 20, 2007, and a bench warrent was

20. issued for their arrest. ( 1 C.T. 237. ) The case was subsequently reset foe trial

21. February 5 2008. ( 2 R.T. 405. )

22.     During pretrial motions, on February 8, 2008, counsel notified the court

23. and prosecution that Sprinkle had declared he would not honor the subpoena and

24. he intended to take his wife to North Dakota to avoid appearing as a witness.

25. Counsel stated that a bench warrent had issued for both Sprinkle and his wife,

26. and that he needed law enforcement to execute the bench warrent.  Counsel indicated

27. that he knew where they could be found in San Jose and stated that he had given

28. the information to the prosecution. ( 1 R.T. 113-114, 122-123. )

29. Counsel then asked what efforts had been made to execute the bench warrant, and

4

1.  the prosecution stated: "That's not my problem." ( 1 R.T. 122. )  The trial court

2.  asked Counsel whether he wanted it to issue another warrant, and counsel replied:

3.  "No. What's the compulsory process all about if law enforcement doesn't go out-

4.  we know precisely where they live, where they work.  These people need to be

5.  arrested and brought in so that we can question them.  I mean, what is the

6.  compulsory process all about?" (1 R.T. 122.)

7.      The trial court stated that the prosecutor should have the police notify the

8.  authorities in San Jose of the outstanding bench warrants, and the prosecution

9.  agreed to do so. (1 R,T. 122-123. )

10.     A jury was selected and opening statements were presented on February 20,

11.  2008. (2 C.T. 420. )  On February 27, 2008, counsel inquired into the status of

12.  the effort to execute the bench warrant on Terry and Tammy Sprinkle. (3 R.T. 703)

13.  The prosecution stated that it had not heard anything from the San Jose Police

14.  Department, and stated that in light of the fact that the trial had been reset

15.  since the subpoena was served, the defense should serve another subpoena and

16.  "see if they'll come now." ( 3 R.T. 704. )

17.     Counsel pointed out that a bench warrant had issued and was still outstanding.

18.  Counsel pointed out that the trial court had ordered the prosecution to notify

19.  the authorities in San Jose to bring the witnesses in, and that he had relied

20.  upon that order to produce them. (3 R.T. 704. )  For the first time, the prosecution

21.  stated that he could not do so: "It's out of our jurisdiction, we cannot make

22.  another agency in another county go do something." ( 3 R.T. 705. )

23.     The trial court asked what counsel would have the prosecution do, "besides

24.  notify the police agency?" ( 3 R.T. 706. )  Counsel replied that the prosecution

25.  should detail what efforts were made to contact the Sprinkles, and that if there

26.  was a showing that Terry Sprinkle could not be located, he should be declared

27.  unavailable and allow his statements to the detectives to be admitted without

28.  his appearance at trial. ( 3 R.T. 706-707. )

29.     The prosecution objected to the admission of the statements, but made no

5

1. showing as to what, if any, efforts were undertaken to secure the attendance of

2. Terry and Tammy Sprinkle. Instead, he again reiterated that defense counsel was

3. required to serve another subpoena. (3 R.T. 707.) The trial court repeatedly

4. stated that it did not know what counsel wanted it to do, and counsel replied

5. that he wanted the court to enforce the compulsory process. (3 R.T. 708)

6. The following colloquy ensued:

7.     Court: I don't go out and enforce warrants that are issued.

8.     Counsel: Well, then we need to find out if anyone has. I mean law enforcement

9. has to enforce - what good is the compulsoty process if nothing can be done?

10.     Trial Court: That is a good question. What good is it? (3 R.T. 708)

11.     Terry Sprinkle was never produced, and the prosecution never described any

12. efforts that were undertaken to secure his attendance.

13.     C.   The Prosecution was required to make good faith efforts to

14.         execute the bench warrant issued for Terry and Tammy Sprinkle.

15.     Allthough the prosecution had been ordered to contact the San Jose Police

16. Department to effect the arrest of the Sprinkles pursuant to the bench warrant,

17. it did not appear that the prosecution made any real effort to comply with that

18. order. Instead, despite the fact that it had agreed to do so, the prosecution

19. belatedly claimed that it had no power to request assistace from the police

20. department in a neighboring county and asserted that the defense was required to

21. issue a new subpoena. These claims were meritless.

22.     As noted by counsel, there is no legal support for the notion that a new

23. subpoena is required when a valid bench warrant is outstanding. 2 (3 R.T. 710.)

24. Nor does it make any logical sense that law enforcement in a neighboring county

25. would be either unwilling or unable to help with the arrest of a person whose

-------------

2 The trial court stated at one point that the bench warrant might not have been
properly served/ supported by an affidavit or that it might not have issued, but
counsel refuted that claim and stated that there had been a hearing at which his
investigator gave evidence to justify the issuance of the warrant. There was no

6

1. adress is known and has been provided. Further, If the prosecution had truely

2. requested assistance from the San Jose Police Department and had been refused. it

3. should have promptly notified the trial court and counsel. The fact that it did

4. not do so, but instead belatedly offered this excuse only after counsel again

5. raised the issue strongly suggests that the prosecution did not make any genuine

6. effort to procure the assistance of any police agency.

7. Thjs deliberate refusal to enforce the compulsory process deprived petitioner

8. of the abillity to present a material witness whose testimony had significant

9. exculpatory value and was thus a direct violation of petitioner's Sixth Amendment,

10. "to have compulsory process for obtaining witnesses in his favor..." It has long

11. been recognized that this right is fundamental to the guarantee of due process

12. and a fair trial.

> The right to offer the testimony of witnesses, and to compell their
> attendance, if necessary, is in plain terms the right to present a defense,
> the right to present the defendant's version of the facts as well as the
> prosecutions to the jury so it may decide where the truth lies,. Just as
> an accused has the right to confront the prosecution's witnesses to establish
> a defense. This right is a fundamental element of due process law.
> (Washington v. Texas (1967) 388 U.S. 14, 19 [18 L. Ed. 2d 1019; 87 S. Ct.
> 1920].)

13. As held in "In re Martin" (1987) 44 Cal.3d 1, this right is also embodied

14. in the California Constitution: "The right to compulsory process is independantly

15. guaranteed by the California Constitution. In the words of article I, section 15,

16. 'The defendant in a criminal case has the right...to compell attendence of

17. witnesses in the defendent's behalf....In light of the similar language in which

18. they are couched, the state constitutional right must be deemed to be at least

19. as broad and fundamental as the federal.'" (Id. at p. 30.)

20. It has been found that a defendant's right to compulsory process may be

21. violated either through intimidation of defense witnesses, or by making the

22. witnesses unavailable. (People v. Coffman and Marlow (2004) 34 Cal. 4th 1, 52.)

23. The latter type of violation was adresses by the Untited States Supreme Court in

24. United States v. Valenzuela-Bernal (1982) 458 U.S. 858. 867 [73 L.Ed.2d 1193,

----------

further discussion of any possible defect in the warrant. (3 R.T. 755-758.)

1.  1202; 102 S.Ct. 3440](Valenzuela). There, the defendant was arrested for the

2.  illegal transportation of aliens into the country. Criminal investigators briefly

3.  interviewed the parties the defendant transported, determined they had no material

4.  information to offer, and deported them before the defense could contact them.

5.  (Id. at p. 861.) On appeal, the defendant obtained a reversal of his conviction

6.  without having made any showing that the deported parties would have provided

7.  beneficial testimony.

8.      The court reversed the dismissal and held that in order to establish a

9.  violation of either the fifth Amendment right to due process or the sixth

10. amendment right to compulsory process, a defendant must show that the prosecution

11. acted in bad faith, and that the testimony would have been "both favorable and

12. material to his defense."(Id. at p. 867, 872-873.)

13.     The required showing of bad faith was explained by the California Supreme

14. Court in In re Martin, Supra, 44 Cal.3d at page 31, as a showing of misconduct -

15. not a showing of actual bad motive - and evidence that the misconduct resulted

16. the loss of the witness. The standards enunciated in In re Martin were employed

17. by the court in People v. Valencia (1990) 218 Cal. App. 3d 808, 827 (Valencia),

18. to find both misconduct and materiality. There, the prosecution had allowed a

19. witness to be deported without notice to the defense. The court found that the

20. police report included a statement by that witness that indicated he might have

21. given at least"arguably" exculpatory testimony on one of the two charges. Thus,

22. the court found that his testimony was material and favorable to the defendant.

23.     With respect to the issue of misconduct, the court concluded that allthough

24. there was no direct evidence that the prosecution knew it had allowed a material

25. witness of the defense to be deported, the fact that the witnesses statement was

26. included in the police reportafforded the prosecution sufficient notice that the

27. witness could have been beneficial to the defense. Upon so finding, the court

28. specifically took note of the fact that the prosecutionnever even tried to justify

29. the deportation; "the prosecution gave no explaination for its failure to give

8

1. respondent or his counsel advance notice of [the witness's] deportation and simply

2. argued, 'it is not a reasonable possibility that [the witness's] testimony would

3. tend to prove the defendant's innocence.'" Finding that this demonstrated

4. misconduct, the court upheld the dismissal of the count to which that witness's

5. testimonywas relavent. (Id. at p. 827.)

6.         **1.  Misconduct is shown here**

7.      The situation before this court is even more egregious than that in Valencia.

8. Unlike the court in Valencia, this court need not speculate as to whether the

9. prosecution was aware that the witness might provide testimony of exculpatory

10. value. The importance of Sprinkle's testimony to the defense was made clear in no

11. uncertain terms on several occasions and in open court. And it was equally clear

12. that the prosecution was highly desirous of preventing Sprinkle from testifying.

13. ( 1 R.T.6-7, 62-125; 3 R.T. 704-710, 736-738, 755-758, 786-795.)  Furthermore the

14. fact that the trial court did find Sprinkle's testimony to be admissible as support

15. for the third party culpability defense is in itself, a strong indication that the

16. testimony qualified as both material and favorable to petitioner. (1 R.T. 119-125.)

17.      The fact that the prosecution was well aware of Sprinkle's importance to the

18. defense serves to stregnthen the proof of misconduct, for it demonstrates that

19. there was motive for its refusal to act. There was no question that, given Sprinkle's

20. reaction to receiving a subpoena, he would never appear voluntarily, and the

21. prosecution was aware of that. Accordingly, the prosecution knew that all it had

22. to do was sit back and refuse to provide the aid of law eenforcement to ensure that

23. Sprinkle would never appear. The prosecuter's every response to counsel's requests

24. for assistance reveals that is exactly what it did.

25.      The notion that the defense should re-serve the subpoena was specious. There

26. is simply no authority and no logic for the prosecution's position that counsel

27. was obligated to serve the witness with yet another subpoena when a valid bench

28. warrent was still outstanding. Notably, and quite properly, the trial court never

29. agreed with that position. Nor did the prosecution ever attempt to provide authority

1. for this position.

2.      Rather, the prosecution made it clear from the outset that he had no intention

3. of assisting counsel in executing the bench warrent. ( 1 R.T. 122. ) And although

4. when the trial court requested that the prosecutor have his officers contact the

5. San Jose Police Department, he agreed to do so (1 R.T. 123.), his subsequent

6. actions demonstrate that he never really honored that request.

7.      Quite the contrary, when some days later, counsel requested an update, the

8. prosecution's response revealed that it very likely had made no effort at all to

9. obtain the assistance of law enforcement. In response to counsel's question, the

10. prosecutor initially stated, "I have not heard anything, that would be the San

11. Jose Police Department." ( 3 R.T. 704. ) That statement standing alone might have

12. indicated some minimal inquiry was made, but the prosecution then added that he had

13. no power to "make another agency in another county do something," and reiterated

14. the claim that the defense was required to serve another subpoena on Sprinkle.

15. ( 3 R.T. 704-705. ) These statements reveal that the prosecution never had any

16. intention of securing the assistance of San Jose Police, and made no effort to

17. do so.

18.      The claim that a police agency in a neighboring county would refuse to assist

19. in the service of a bench warrant is difficult to credit, and significantly, it was

20. never supported by anything more than the prosecutors belated and non-specific

21. assertion. In any event, although it may have been more convenient to do so, the

22. prosecutor was not limited to reliance upon the assistance of San Jose authorities;

23. the officers in this case had the authority to execute the bench warrant

24. themselves. ( §830, et seq. )

25.      In addition, the notion that the service of yet another subpoena on a party

26. who has already made it abundantly clear that he does not feel bound to obey its

27. mandate - and indeed threatened to leave the state to avoid attending the trial -

28. might succeed where the first service failed is patently absurd. ( §830, et seq.)

29. A      A witness so recalcitrant he not only fails to appear, but declares he will

1.  never do so is not someone who will suddenly recover his senses and cooperate if a

2.  second subpoena is served.

3.       It is for just such a witness that bench warrants are designed, because a bench

4.  warrant is the only means of obtaining such a witness's appearence. But a private

5.  party cannot execute a bench warrant, only a law enforcement officer is empowered

6.  to do so. ( Code of Civ. Proc. § 1993, subd. (a)(1).) This means that defense counsel

7.  has no choice but to rely on the assistance of law enforcement once a bench warrant

8.  has issued for a witness. If such assistance is not provided, the right to compulsory

9.  process is meaningless; it is a right without a remedy.

10.      As counsel aptly stated:"We now need the guys that carry the guns to go out

11.  and get Mr. Sprinkle in here because of the kind of person he is, this statement

12.  that he's made about not comming into this courtroom. I don't know what more you

13.  could expect me to do at this point in time, we got the guy served, there's a bench

14.  warrent out for his arrest, now it's all up to the compulsory process at this point

15.  in time to get the guy in." ( 3 R.T. 738 ) Indeed, theree was nothing more that

16.  counsel could have done. The defense was effectively stymied in its effort to

17.  secure Sprinkle's attendance by the prosecution's refusal to act.

18.      Furthermore, and significantly, when asked by counsel to describe the efforts

19.  made to execute the bench warrant for Sprinkle, the prosecution never responded.

20.  Rather, the prosecution again asserted that the defense was obligated to serve

21.  another subpoena ( 3 R.T. 706-707. ) This refusal to present any information as to

22.  what was done to secure the attendance of Terry and Tammy Sprinkle is very

23.  similar to the failure of the prosecution in Valencia to justify the deportation

24.  of the witness - a failure the court deemed to be "noteworthy." ( People v. Valencia,

25.  supra, 218 Cal.App.3d at p. 827. )

26.      Thus, the totality of the circumstances establishes that the prosecution

27.  precluded the defense from presenting the testimony of Terry Sprinkle by its

28.  deliberate refusal to execute the bench warrant. The required showing of misconduct

29.  is therefore satisfied.

1.          **2. The testimony of Sprinkle was both material and favorable**

2.          The material benefit of Sprinkle's testimony was thoroughly described by

3.  counsel on numerous occations as the question of the admissability of Sprinkle's

4.  testimony to support a third party culpability defense was hotly contested.

5.  Ultimately, the trial court found sufficient exculpatory value and weight in

6.  Sprinkle's statement to justify the admission of his testimony, and the extensive

7.  arguement that proceeded the ruling shows it was not arrived at lightly. ( 1 R.T.

8.  62- 125. )Thus, as previously noted, this ruling alone provides strong support for

9.  the conclusion that Sprinkle's testimony would have been material and favorable to

10. patitioner. More specifically, Sprinkle's appearance would have permitted the

11. defense to elicit the following testimony:

12.          In September of 2001, Sprinkle, who was on parole, was the sole owner and

13. driver of a Bronco that matched the description of the one Zunino was last seen

14. entering. That vehicle was spotted in the neighborhood of the crime scene on

15. September 27, 2001, just one day after Zunino was found. A substance was observed

16. on the back seat that appeared to be blood. ( 1 R.T. 6-7, 62-63; 2 R.T. 370-374,

17. 378-379; Terry Sprinkle statement pp. 4-5. )

18.          The police immediately contacted Sprinkle and conducted a legnthy interview

19. on September,28, 2001. Although Sprinkle denied any involvement in the homicide,

20. in the course of that interview, Sprinkle made several notably suspicious statements:

21. 1) he denied ever having known Zunino, but it was established that they had

22. attended high school together (Terry Sprinkle statement pp. 52-53), 2) He denied

23. having been in the Stockton area in the past year, but Officer Fields saw his

24. Bronco parked in the AM/PM Market parking lot the day after Zunino's body was found

25. ( 2 R.T.370-374, 378-379 ), 3)he gave conflicting explainations for the potential

26. presence of blood in his Bronco, i.e., that he had slapped a prostitute a year

27. earlier and caused her to have a nose bleed, and that he picked up prostitutes

28. who were intravenous drug users who injected themselves in the back seat ( terry

29. Sprinkle statement pp. 45, 55,57 ), 4) He had fresh cuts on his hands and shins

12

1. (Terry Sprinkle statement pp. 7-8), 5)He admittedly frequented the prostitutes in
2. the area ( Terry Sprinkle statement pp. 15-17, 46-47 ).

3.     The trial court rulled that the above information could be elicited, but
4. excluded testimony concerning Sprinkle's arrest for a fatal knifing in 1979, and
5. a robbery and kidnapping of a woman in the 1980's, and violent conduct with his
6. wife that caused her to file a temporary restraining order. (1 R.T. 105-125.)

7.     The nature of the evidence presented at trial reveals cracks and fissures in
8. the proof of petitioner's guilt that might well have caused the jury to reach a
9. different verdict had Sprinkle testified. Yoshida excluded Sprinkle's Bronco
10. based on her tire tread analysis, but this case was only the second time she had
11. testified concerning tire tread comparisons. ( 2 R.T. 426, 439, 444-445. )
12. In addition, there was some doubt as to the accuracy of the measurements that had
13. been taken of the treads at the crime scene. Yoshida did not take those measurements
14. herself, and she agreed that accuracy was difficult on such uneven terrain.
15. ( 2 R.T. 475-476, 521, 523. )

16.     The method used to measure the tire stance of the Bronco was also unknown.
17. Yoshida had not documented how the Bronco tires had been measured  and because it
18. had been returned to Sprinkle, no further examination of the tires to confirm the
19. accuracy of the measurements was possible. ( 2 R.T. 510. ) Moreover, her finding
20. as to petitioner's Blazer was inconclusive: she could only say that the treads were
21. consistant, there were insufficient individual characteristics to state that the
22. crime scene treads were made by petitioner's Blazer to the exclusion of any other
23. car with the same brand of tires. ( 2 R.T. 450-451, 459, 526-527, 564-565.)

24.     Furthermore, although Yoshida did not find evidence of blood in Sprinkle's
25. Bronco, she stated that cleaning solvents such as laundry bleach could eradicate
26. any detectable trace. ( 2 R.T. 441-442, 513, 586. ) In any case, the lack of blood
27. in the Bronco is of little moment. As the prosecutor argued, the evidence indicated
28. that the killing likely did not occour in the car, and by the time Zunino's body
29. was put into it, she was no longer bleeding out.

13

1.      The fact that petitioner's semen was found on Zunino's anal swab indicates

2.   there was sexual contact, but that does not inexorably lead to the conclusion that

3.   petitioner killed her. Contrary to the trial court's assertion, the fact that sperm

4.   was found on the anal swab did not necessarily mean that it was deposited shortly

5.   before Zunino's death. ( 4 R.T. 1104. ) There was no evidence to that effect.

6.   Indeed, to the contrary, Dr. Lawrence stated that he did not observe any evidence

7.   that allowed him to determine how long before death the semen was deposited.

8.   ( 3 R.T. 777. )

9.      Dr Lawrence also indicated that the small tear found on the skin of her anus

10.  had many possible causes and could not be aaid to have been the result of

11.  forcible sodomy. ( 3 R.T. 771. )

12.      Lastly, the condition of petitioner's Blazer made it clear that it had not

13.  been driven, and had remained in his father's backyard since the collision in

14.  October of 2001. There were multiple stickers on the rear window of the Blazer and

15.  a Grateful Dead sticker on the windshield. ( 2 R.T. 539-540. ) These distinguishing

16.  characteristics would have been plainly visable to Valtierra. However, she stated

17.  that she did not see any such stickers on the car that Zunino entered on

18.  September 26, 2001, and when she testified at the preliminary hearing ahe excluded

19.  petitioner's car as the one Zunino entered. ( 2 R.T. 308-310; 318-322; C.T. 51-52. )3

20.      The evidence thus left open the possibility that petitioner had consentual

21.  sex with Zunino, and that another person killed her thereafter. Given Sprinkle's

22.  multiple admissions concerning his association with  prostitutes, the fact that

23.  his car matched Valtierra's description, the fact that his car was spotted in

------------------------------

3 There was also an indication at the motion for a new trial that Valtierra may
have changed her testimony after the preliminary hearing and identified the photo
of petitioner's car because she had been paid money out of the confidential
informant fund. (4 R.T. 1066-1073.) Moreover, the motion for a new trial revealed
that the prosecution's theory that Zunino would never have willingly engeged in
anal sex was severly flawed. Both Bobbie Pritz and Paul Ramirez testified from
first hand knowlege that while Zunino may not have enjoyed anal sex, she certainly

14

1.  Stockton the day after Zunino was found, the fact that he had fresh wounds on his

2.  hands and shins, and the fact that he lied about having been in Stockton or knowing

3.  Zunino,  that possibility would have gained considerable weight had Sprinkle been

4.  brought before the jury. Thus, the evidence easily demonstrates that there was

5.  reasonable possibility that Sprinkle's testimony would have been both material

6.  and favorable to petitioner. ( In re Martin, supra, 44 Cal.3d at p. 31; United

7.  States v. Valenzuela-Bernal, supra, 458 U.S. at p. 873; United States v Dring

8.  (9th Cir. 1991) 930 F.2d 681. 693 [defendant need only make a "plausible showing"

9.  that evidence would have been material and favorable]. )

10.     By refusing to execute the bench warrant for Sprinkle and his wife, the

11.  prosecutioninfringed upon not only petitioner's right to compulsory process, but

12.  also his right to due process. This infringement was tantamount to the supression

13.  of exculpatory evidence. As held in Brady v. Maryland (1963)373 U.S. 83: "the

14.  supression by the prosecution of evidence favorable to an accused upon request

15. violates due process where the evidence is material either to guilt or punishment,

16.  irrespective of the good faith or bad faith of the prosecution." ( Id at p. 87. )

17.     The record shows that the prosecution knowingly refused to assist in the

18.  execution of the bench warrant for a witness whose testimony possessed

19.  acknowledged exculpatory value for petitioner. There is no question that the

20.  prosecution was well aware that this inaction would preclude the defense from ever

21.  securing this witness's appearance; counsel made that abundantly clear. Thus, by

22.  doing nothing, the prosecution was assured that the witness whose testimony it had

23.  vehemently sought to exclude would never appear, and the record supports the

24.  inference that is precisely what happened. Accordingly, both misconduct and

25.  materiality are established. Because petitioner's constitutional rights to due

26.  process and compulsory process were violated, the conviction cannot stand and the

27.  judgement must be vacated. (People v. Coffman and Marlow, supra, 34, Cal.4th at p.52.)

----------------------

    did engage in it. (4 R.T. 964, 987-988.)

D.   **The Trial Court had a Duty to Enforce its Own Ruling and to**
     **Provide assistance to Counsel to Achieve the Execution of the**
     **Bench Warrant.**

1.    The record shows that the witness's whereabouts were no mystery, and that the

2.   witness was certainly not beyond the trial court's subpoena powers. Thus, Sprinkle's

3.   attendance could still have been secured in time for him to testify had the trial

4.   court exercised its own power to intervene.

5.        This point was addressed by the court in People v. Schroeder (1991) 227

6.   Cal.App.3d 784, 788, the defense witness elected to testify against the advice

7.   of her lawyer. The judge repeatedly advised the witness of her right against self

8.   incrimination, and required her to testify outside the presence of the jury

9.   concerning her rejection of the lawyers advice. The witness ultimately decided

10.   not to testify. ( Id at pp. 789-793. ) The court found that the trial court had

11.   overstepped the approiate bounds of its duty to ensure that the witness knew of

12.   the dangers of self incrimination and was improperly coercive. Upon finding that

13.   the witness, a co-particapant in the crime, was material, the court determined that

14.   the trial court's action in dissuading the witness from testifying severly

15.   undermined the defense and reversed the judgement. ( Id at pp. 793-794. ) In its

16.   opinion, the court observed that "A defendant's right to due process of law can

17.   be violated by judicial conduct." ( Id at p. 788. )

18.        The corollary to that statement is shown in this case,e.g., that a defendant's

19.   right to due process of law can also be violated by state inaction. This inaction

20.   was noted in the opening brief. When defense counsel asked "what good is the

21.   compulsory process if nothing can be done?" the trial court responded, "That is a

22.   good question. What good is it?" ( 3 R.T. 708. )(AOB 23.) In essence, when the

23.   defense asked the trial court to enforce its own order, the trial court effectively

24.   threw up its hands and declared itself incapable of implementing petitioner's

25.   right to compulsory process. ( See 3 R.T. 708. )

26.        As petitioner noted in the opening brief, the right to compulsory process is

1. meaningless if it is not enforced. ( AOB 30. ) Although the trial court properly

2. ordered the prosecution to have his officers contact the San Jose Police Department,

3. when the prosecution offered nothing more than the fact that he had not "heard

4. anything" the trial court should have taken further action; whether it was by

5. means of ordering the prosecution to inform the San Jose Police Department that

6. the court was requesting their assistance, or by ordering a marshal to execute

7. the bench warrants, or by issuing a direct order to the investigating officer on

8. the case.

9.        The bottom line is that there were several viable means of honoring petitioner's

10. right to secure the attendance of witnesses, but all of them were ignored. The

11. defense served subpoenas, had the bench warrants issued, obtained a court order

12. to compell law enforcement assistance in executing the warrants, then repeatedly

13. pleaded with the trial court to enforce that order ( 3 R.T. 704-708 ); that was

14. all the defense could do. The only avenue left was to have "the guys that carry

15. the guns" go out and apprehend the witnesses - something that could only be

16. accomplished by state action. ( 3 R.T. 738. ) By failing to utilize the assistance

17. of law enforcement to secure the attendance of these critical defense witnesses,

18. both the prosecution and the trial court, i.e., the state thwarted petitioner's

19. right to due process and deprived him of a fair trial.

       **E.**   **The Court of Appeal Opinion**

20. The opinion of the court of appeal was erroneous in several respects. First, the

21. Court of Appeal incorrectly stated that the prosecution "lacked the power to

22. force the San Jose police to do anything." The court then hypothesized that

23. "[v]ery possibly the out-of-county bench warrants - for $2500 - were viewed as a

24. low priority, but that was not the fault of the prosecutor in this case." ( people

25. v. Nuccio, supra, slip opin. at p. 12. ) There is no record to support the claim

26. that the prosecutor either did or would have encountered resistance to a request

27. for help from a neighboring county police force for this or any other reason.

28. More importantly, as petitioner pointed out, the prosecutor did not need to rely

1.  upon the assistance of another police agency. The investigating officer on this

2.  case had the authority and power to execute the bench warrant.

3.  Second, the court of appeal erroneously adopted the reasoning of respondent

4.  in agreeing that the prosecution had done all that was required of it by notifying

5.  SanJose authorities. ( People v. Nuccio, supra, slip opin. at p. 12. ) This claim

6.  implies that the prosecution could leave a message on an answering machine and

7.  walk away. While that may indeed have been what the prosecution did, it was surely

8.  not what the trial court intended. Such minimal, teshnical compliance flouted the

9.  spirit and intention of the court order, which was to get the official assistance

10. necessary to bring in witnesses who would not come to court voluntarily. No doubt,

11. the trial court could and should have issued its order in stronger terms, but

12. neverthrless, the intent of the order was plain enough.

13. And this leads to the crux of the due process violation at issue here. For

14. these circumstances reveal that a defendant's right to compulsory process may be

15. violated not only by the prosecution's malfeasance, i.e., by deporting the witness,

16. but it may also be violated by the prosecution's nonfeasance. Recall that before

17. the trial began, the prosecutor agreed to enlist the assistance of the police in

18. executing the bench warrant ( 1 R.T. 123. ) This created a reasonable expectation

19. by the defense that the prosecution would have officers go out and locate the

20. witnesses. That this was in fact counsel's understanding was made clear during

21. the midtrial hearing concerning the execution of the bench warrants when counsel

22. replied to the court: "...the last time we discussed it I told you there was a

23. bench warrant, you told him to tell law enforcement to go pick the guy up."

24. ( 3 R.T. 704. )

25. And as all parties knew, counsel had no choice but to rely upon the prosecution,

26. since only a law enforcement officer can execute a bench warrant. ( Code of Civ.

27. Proc.§ 1993, subd. (a)(1). ) Thus stymied, and misled into relying upon the

28. prosecution, it was not until the middle of the trial that counsel discovered

29. the prosecution had no intention of requesting that any officer go out and find

18

1.  the witness. ( 3 R.T. 703-704. )

2.      Had counsel known that the prosecutor would do little more than leave a
3.  message with someone at the San Jose Police Department, he could have requested
4.  that the trial court intervene to require that the prosecution have officres go
5.  out and apprehend the witnesses in time to appear at trial. But the prosecution
6.  never reported on what had been done to locate the witnesses untill the defense
7.  raised the issue in the middle of trial. Thus, the prosecution misled the defense
8.  into believing that meaningful efforts to apprehend the witnesses were ongoing,
9.  when in fact, no such efforts had been made. As a result, through its inaction,
10. the prosecution was able to successfully thwart petitioner's right to compulsory
11. process.

12.     The fact that the prosecution stated it had not heard from the San Jose Police
13. Department does not show that the prosecution necessarialy made any effort to
14. comply with the trial court's order  Indeed, the fact that defense counsel asked
15. the prosecution to detail what efforts it had made and received no response is
16. some indication that very little was done. In its opinion, the Court of Appeal
17. ignores the fact that defense counsel made this request and received no response,
18. ostensibly because defense counsel did so in order to argue that Sprinkle was
19. unavailable and thus permit his statements in absentia pursuant to Evidence Code
20. section 1291. (3 R.T. 706-707. )(People v. Nuccio, supra, slip opin. at pp. 11-12 )
21. But the reason for counsel's request is irrelevant. The fact remains, he made the
22. request, and received no response. In noting that counsel failed to "press for a
23. ruling from the court or for a reccord about the prosecutor's actions in trying
24. to get the warrant served on Sprinkle," the Court of Appeal fails to acknowlege
25. the significance of the fact that the prosecution was asked to describe what it
26. had done and it failed to give an answer. ( People v. Nuccio, supra, slip opin.
27. at p. 11 )This fact should not be ignored simply because counsel did not
28. continue to demand a response.

29.     Third, the Court of Appeal implicitly found that any failure on the part of

1.   the prosecution to fulfill its duty was irrelevant because "Sprinkle had vowed

2.   never to appear as a witness", and that "he had no natural motive to appear at a

3.   trial where he would be blamed for sodomizing and murdering a prostitute,"

4.   (people v. Nuccio, supra, slip opin. at p.12. ) In so holding, the Court of

5.   Appeal relied upon the cases of People v. Harris(2005) 37 Cal. 4th 310. 344; see

6.   People v. DePriest(2007) 42 Cal.4th 1,55-56. (People v. Nuccio, supra, slip opin.

7.   at p. 13. ) Neither case is opposite.

8.         Harris bears virtually no resemblance to this case: 1) the witnesses in

9.   Harris were in the state of Illinois and thus beyond anyone's subpoena power,

10.  2) the trial court really had excluded all the evidence to which those witnesses

11.  might have testified, and 3) even if the testimony had not been excluded, it

12.  would not have been either material or favorable to the defendant. ( Harris,

13.  supra, 37 Cal.4th at p. 344. ) Those are not the circumstances in this case.

14.        In DePriest, the defense complained that a detective's interference

15.  adversely affected the testimony of one beneficial defense witness and prevented

16.  the appearance of another at the penalty phase of his trial. Both were relatives

17.  whose testimony was relevant as mitigating evidence. ( DePriest, supra, 42 Cal.4th

18.  at p. 55. ) This court found that the detective did not behave inapproiately,

19. and that the defendant did not lase any beneficial testimony. One witness did

20.  appear and testified favorably to the defendant, and the other would not have

21.  offered favorable testimony regardless of anything the detective did. Thus, in

22.  DePriest there was no issue concerning the prosecution's misleading representations

23.  that caused the defense to detrimentally rely on their assistance in executing

24.  a bench warrant, or in the trial court's failure to exercise its own powerto assist

25.  defense counsel in that regard. Furthermore, unlike DePriest, it didn't matter

26.  whether Sprinkle would volunteer favorable testimony. The bebeficial nature of

27. · Sprinkle's appearance lay in counsel's ability to confront him with statements

28.  he had given to a police officer. No matter what he said on the witness stand,

29.  his appearance would have afforded counsel to confront him with those inculpatory

1.   statements. Thus, there was no question here that Sprinkle's appearance would

2.   have been highly beneficial to the defense.

3.       Fourth, in adressing the issue of the materiality of sprinkle's testimony,

4.   the court of appeal erroneously found that "the trial court had excluded virtually

5.   all of the evidence about Sprinkle." The court of appeal further stated, "[a[ppealate

6.   counsel cites many other facts from Sprinkle's statement but, ultimately, that

7.   statement was excluded in its entirety by the trial court because Sprinkle had

8.   made no statements against penal interest." ( People v. Nuccio supra, slip opin.

9.   at p. 12, 14-15. )

10.      This finding was incorrect, and seems to have been based on the conflation

11.  of two seperate rulings made by the trial court concerning the admissibility of

12.  Sprinkle's statement, only one of which was relevent to this appeal. During

13.  pretrial motions, the parties litigated what would be admissable if Sprinkle

14.  appeared at trial. That ruling - the only one relevant to this appeal - in fact

15.  permitted a great deal of the most critical aspects of Sprinkle's statement, and

16.  counsel for petitioner recited that ruling in the opening brief as follows:

17.       Although Sprinkle denied any involvement in the homicide, in the course of
18.       that interview, Sprinkle made several notably suspicious statements: 1) he
19.       denied ever having known Zunino, but it was established that they had
20.       attended high school together ( Terry Sprinkle statement pp. 52-53. ),
21.       2) he denied having been in the Stockton area in the past year, but Officer
22.       Fields saw his Bronco parked in the AM/PM Market parking lot the day after
23.       Zunino's body was found ( 2 R.T. 370-374, 378-379. ),3)he gave conflicting
24.       explainations for the potential presence of blood in his Bronco, i.e., that
25.       he had slapped a prostitute a year earlier and caused her to have a nose
26.       bleed, and that he picked up prostitutes who were intravenous drug users
27.       who injected themselves in the back seat (Terry Sprinkle statement pp. 45,
28.       55, 57 ), 4) he had fresh cuts on his hands and shins (Terry Sprinkle
29.       statement pp. 7-8 ), 5)he admittedly frequented the prostitutes in the area
30.       ( Terry Sprinkle statement pp. 15-17, 46-47 ).

31.       The trial court ruled that the above information could be ilicited, but
32.       excluded testimony concerning Sprinkle's arrest for a fatal knifing in 1979,
33.       and a robbery and kidnapping of a woman in the 1980's, and violent conduct
34.       with his wife that caused her to file a temporary restraining order.
35.       ( 1 R.T. 105-125. )
36.  ( AOB 34-35. )

37.      This passage demonstrates that, far from excluding Sprinkle's statement "in

38.  its entirety," the trial court admitted a great deal of the most highly critical

1.  portions of Sprinkle's statement.

2.      However, subsequent to that ruling, when defense counsel realized that he
3.  could not secure Sprinkle's appearance, counsel attempted to have the statement
4.  admitted as a declaration against penal interest. It was in response to that
5.  request that the trial court ruled Sprinkle's statement inadmissible. ( 3 R.T. 786,
6.  791, 794-795. )

7.      The court of appeal cited the passage thatrefers to that latter ruling in
8.  asserting that Sprinkle's statement was virtually excluded in its entirety.
9.  But the admissability of Sprinkle's statement vel non as a declaration against
10. penal interest was never at issue in this appeal. At issue in this appeal was the
11. violation of petitioner's right to compulsory process to secure the attendance of
12. this witness. Thus, the materiality of the evidence that could have been elicited
13. had Sprinkle appeared at trial was what had to be shown. ( In re Martin, supra,
14. 44 Cal.3d 1, 31; United States v. Valenzuela- Bernal, supra, 458 U.S. 858, 873
15. [73 L.Ed.2d 1193; 102 S.Ct 3440]; United States v. Dring, supra, 930 F.2d 681, 693. )
16. That the trial court ruled the statement could not come in as a declaration
17. against penal interest had no bearing on this issue.

18.     Accordingly, the ruling upon which the court of appeal relied to stated that
19. Sprinkle's statement was excluded "in its entirety," was irrelevant. (People v.
20. Nuccio,supra, slip opin. p. 13. ) It didn't matter whether the statements were
21. admissable as $_a$ declaration against penal interest, because___ the trial court
22. had already ruled that the statement largely was admissible if Sprinkle took the
23. stand    to testify. For this same reason, the court of appeals further observation
24. that "we cannot know haw Sprinkle would have testified, but we cannot assume that
25. he would have incriminated himself, absent some record of admissable incriminating
26. statements he may have made," was incorrect. ( Emphasis origional ) ( People v.
27. Nuccio, supra, slip opin. p. 14. )

28.     Ther was a record of admissable incriminating statements, and the trial
29. court had previously ruled that the defense could use them if Sprinkle took the

1.   stand. ( Evid. Code § 1235. ) Therefore, it was incorrect that Sprinkle's statement

2.   was inadmissable "in its entirety" for any reason that was relevant to this appeal.

## CONCLUSION

3.       For the foregoing reasons petitioner Joseph Nuccio respectfully requests

4.   that this court grant review in this matter and make a decision on the merits.

5.   Upon such review, petitioner requests this court reverse the judgement of the

6.   Court of Appeals, based on the arguements set forth herein.


Respectfully submitted,

DATED : 9-20-2010

Joseph Hathorn Nuccio  G - 15270

23

PROOF OF SERVICE BY UNITED STATES MAIL
(Code of Civil Procedure, Section 1015)
(28 U.S.C. Section 1746)

I, __Joseph Nuccio__ , declare, depose and say, the following statement is true and correct under penalty of perjury according to the laws of the State of California based on matters known to me personally to be true:

1)    I am over the age of eighteen years, a resident and prisoner of the State of California with a present mailing address of: High Desert State Prison, P.O. Box 3030, Susanville, CA 96127-3030.

2)    On this __20__ , day of __September__ , 20__10__, I caused a true and correct copy of the following, specifically described document(s) to wit:

__Petition for Writ of Habeas Corpus__

at the prison to be placed in a sealed envelope(s), with First Class postage having been placed thereon, fully addressed to the interested person(s) described hereinafter, back of the envelope(s) signed and dated by a Correctional Officer and then deposited such envelope(s) in the prisons internal legal mail system for processing and delivery to the United States Postal Service, for delivery to the addressee(s):

Clerk of the U.S. District Court
for the Eastern District of California
501 I Street, Room 4 - 400
Sacramento, CA   95814

3)    I declare that there has been regular U.S. mail pick-up by the Correctional Officers at the prison where I posted the envelope(s) that are described above, and regular communication by mail between the place of mailing and the place(s) so addressed.

Executed this __20__ , day of __September__ , 20__10__ under penalty of perjury according to the laws of the State of California, in Lassen County, City of Susanville.

_____
Declarant