UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH HATHORN NUCCIO,<br><br>Petitioner,<br><br>v.<br><br>M.D. McDONALD,<br><br>Respondent. | No. 2: 10-cv-2652 TLN KJN P<br><br><br>FINDINGS & RECOMMENDATIONS |

Introduction

Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2008 conviction for first degree murder with a knife use allegation. (Cal. Penal Code §§ 187, 12022(b)(1)). Petitioner is serving a sentence of twenty-six years to life.

Petitioner alleges that the prosecutor and trial court violated his right to compulsory process by failing to ensure the attendance at trial of defense witness, Terry Sprinkle. For the following reasons, the undersigned recommends that the petition be denied.

Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or

1

application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision,

2

"and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at 784-85. That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct. 1088, 1096 (Feb. 20, 2013). "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim. Id., at 1097.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record. "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S. Ct. at 784. "[A] habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786.

Factual Background

The opinion of the California Court of Appeal contains a factual summary. Petitioner adopts the statement of facts contained in the state appellate court's opinion with one exception, which will be discussed herein. The opinion of the California Court of Appeal summarizes the facts of petitioner's conviction as follows:

////

This was a "cold hit" DNA case. On October 11, 2006, defendant was charged with killing Jody Lynn Zunino on September 26, 2001. She was a prostitute who had been picked up by a customer in the Wilson Way area of Stockton, and whose body was found in a nearby field.

An eyewitness saw the victim on Wilson Way that night, talking to a man who looked like defendant.

Three witnesses testified the victim did not like to perform or would refuse to perform anal sex. Because her anus had a slight injury, and defendant's semen was found inside her rectum, this tended to show defendant forced himself upon her.

The victim's body was found nearly nude in a field, with tire tread marks nearby and across her arm and leg, and with a knife she had borrowed from a friend that night next to her. Her throat had been cut and her body bore other slashing injuries.

An eyewitness saw the victim get into a vehicle she described as a white Bronco with tinted windows, but she was not familiar with vehicles and identified photographs of defendant's white Chevrolet Blazer, which the witness referred to at trial as a "Bronco." She had previously told an officer that a photograph of a Bronco the officer had printed off the Internet "looked similar" to the vehicle she had seen, and the photographs in evidence of defendant's Blazer and the Bronco from the Internet show that the vehicles are similar to each other.

The day after the murder, a peace officer saw a Ford Bronco in the Wilson Way area, and it was registered to Terry Sprinkle, a parolee. Sprinkle's house and Bronco were searched, but nothing was found.

A criminalist testified defendant's Blazer had tire treads consistent with the tread marks found near and on the victim's body, but the tread was not unique, that is, she could not testify defendant's Blazer, to the exclusion of other similar vehicles with similar tires, made the tread marks at the scene. Terry Sprinkle's Bronco could not have made those tread marks.

Defendant did not testify, but in argument challenged the drug-using percipient witnesses, challenged the expertise of the tire-tread analyst, and pressed the theory that a desperate, heroin-addicted prostitute might not be choosy about what type of services to perform; therefore, while defendant may have had anal sex with the victim, there was a reasonable doubt whether he killed her.

The jury convicted defendant of first degree murder and found the deadly weapon (knife) enhancement true.

A new trial motion based on newly discovered evidence included the declaration of the victim's former boyfriend, who claimed they regularly had anal sex, and the declaration of a prostitute who claimed the victim admitted having anal sex. After hearing testimony from these witnesses, each of whom had abused drugs

and had convictions reflecting moral turpitude, the trial court denied the motion for a new trial.

People v. Nuccio, 2009 WL 3418503 at *1-2 (Oct. 26, 2009).

In the petition, petitioner states that he adopts the statement of facts contained in the opinion of the California Court of Appeal but for the statement that the eyewitness testified that he saw the victim on the night of the murder talking to a man who looked like the defendant. (ECF No. 1 at 4.) Petitioner states that the witness testified that he saw the victim with someone who looked like the defendant on the "morning" of September 25, 2001. (Id. at 11.) Petitioner states that the murder did not occur until after 1 a.m. on the morning of September 26, 2001. (Id.)

Discussion

   *Alleged Prosecutorial Interference*

The California Court of Appeal was the last state court to issue a reasoned decision as to this claim. Accordingly, the undersigned considers whether the denial of this claim by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. See 28 U.S.C. § 2254(d)(1) (habeas petition shall be granted only if the state court judgment resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court).

The California Court of Appeal denied this claim for the reasons stated herein:

> Defendant contends the prosecutor deliberately refused to assist him in securing Terry Sprinkle's presence at trial, causing the loss of exculpatory evidence. We reject this contention of error.
>
> The general rules about prosecutorial interference with defense witnesses are as follows:
>
> "In order to establish a violation of his constitutional compulsory-process right, a defendant must demonstrate misconduct. To do so, he is not required to show that the governmental agent involved acted in bad faith or with improper motives. [Citations.] Rather, he need show only that the agent engaged in activity that was wholly unnecessary to the proper performance of his duties and of such a character as 'to transform [a defense witness] from a willing witness to one who would refuse to testify....' [Citations.]
>
> "To establish a violation, the defendant must also demonstrate interference, i.e., a causal link between the misconduct and his inability to present witnesses on his own behalf. To do so, he is not

5

required to prove that the conduct under challenge was the 'direct or exclusive' cause. [Citations.] Rather, he need only show that the conduct was a substantial cause. [Citations.] The misconduct in question may be deemed a substantial cause when, for example, it carries significant coercive force [citation] and is soon followed by the witness's refusal to testify [citation].

"Finally, the defendant must also demonstrate 'materiality.' To carry his burden under federal law, 'he must at least make some plausible showing of how [the] testimony [of the witness] would have been both material and favorable to his defense.' [Citation.] Under California law he must show at least a reasonable possibility that the witness could have given testimony that would have been both material and favorable." (In re Martin (1987) 44 Cal.3d 1, 31-32; see People v. Schroeder (1991) 227 Cal.App.3d 784, 787-788.)

As we explain, the record does not support the claim that the prosecutor deliberately refused to help secure Sprinkle's presence at trial or interfered with defense counsel's efforts. So far as this record shows, the prosecutor did everything he was supposed to do. Further, defendant cannot show causation or materiality: Sprinkle adamantly did not want to testify, and his presence at trial would not have changed the result.

Defendant had made discovery requests regarding Sprinkle, who, as indicated above, had been investigated shortly after the murder. On September 7, 2007, shortly before trial was then scheduled to begin, defendant moved to compel discovery regarding Sprinkle's criminal record.

On September 20, 2007, Sprinkle and his wife failed to appear in response to defense subpoenas, and the trial court (Vlavianos, J.) issued bench warrants for $2,500 for each of them.

When the People disclosed that Sprinkle had several theft-related priors, defendant pressed for records of those cases, as well as other incidents.

On October 5, 2007, defendant again moved to compel discovery about Sprinkle's criminal record. Also that day, defendant moved to be allowed to introduce third party culpability evidence, making the following offer of proof: The day after the murder, an unknown man told a detective that the victim was last seen getting into a white Ford Bronco, and handed the detective a paper with the license plate number "4PMZ262." That day a police officer saw a "tall white male, balding on top," driving that Bronco, and it was found to be registered to Sprinkle. Sprinkle, a parolee, was arrested in Calaveras County the next day, while driving that Bronco. Sprinkle told the police that he had not been to Stockton for several months, but when told he had been seen there the day before by an officer, admitted he had lied. He admitted visiting prostitutes in the Wilson Way area, and stated he had been accused of raping a prostitute about a year before. When the police showed him a picture of the victim, he denied knowing her, even after being told that he and the victim had gone to Lodi High School together.

6

Later, Sprinkle admitted he knew the victim in high school. Sprinkle has convictions for drugs and violence, is large, physically fit and trained in martial arts, and has been to prison. He once threatened to cut his wife's throat with a knife. The tire tread marks found near the body were similar to those made by Sprinkle's Bronco.

The People opposed the motion, providing details that tended to weaken the offer of proof regarding Sprinkle, including the fact that Sprinkle had an alibi, no incriminating evidence was found in his Bronco, and the tire treads at the scene did not match his Bronco.

At a hearing on February 6, 2008, when the trial court asked who had last spoken to Sprinkle, defense counsel stated "We have served him with a subpoena and he said, you will never get me in court. I'm going to take my wife and we are going to go to North Dakota, and she is not going to testify and I'm not going to testify." Nothing in the record suggests Sprinkle ever changed his avowed intention to avoid this trial.

The trial court observed that it had issued the warrant to search Sprinkle's house and truck back in 2001, and that the return showed no evidence was found, weakening the claim of third party culpability. Eventually the trial court ruled that Sprinkle could be asked about his Bronco and some statements he made, specifically, that if the police found blood in his Bronco, it was from drug-using prostitutes and that he had slapped a prostitute, but to get those statements in, "Sprinkle is going to have to be here."

At that point, defense counsel asked "What are we [going] to do about getting the guy here?" The prosecutor stated "That's not my problem" and the trial court stated "That's not my-I don't go subpoena witnesses." The trial court asked defense counsel if the Sprinkles still lived in the foothills, and he said, "No, they live in San Jose and she works down in San Jose. We have all that information." The prosecutor said, "we can notify [the San Jose Police Department] that there is a bench warrant out for their arrest. I think we can do that." And the court said "Okay."

The issue was revisited towards the end of trial, in several discussions that took place in between testimony.

At the morning break on February 27, 2008, defense counsel noted that the People were almost done with their case, and asked "what progress has been made" regarding the warrants. The trial court asked if the prosecutor had heard anything and the prosecutor said: "I have not heard anything, that would be the San Jose Police Department. Further, they have not been subpoenaed for this trial, this trial has been reset many, many times, there was a reset I believe in January or December that that was issued. I believe they're still in their homes, I think that the Defense should actually go down there and subpoena them to Court and see if they'll come now."

7

Appellate counsel interprets this passage to mean that the prosecutor never contacted the San Jose authorities. We do not read the passage that way. The prosecutor represented to the court that he would contact the San Jose authorities and, in this passage, in response to a question by the court, states he had not heard anything back. Absent any information in the record to the contrary, we do not infer that the prosecutor failed to do what he said he would do, or that he made a misrepresentation to the court. The fact the prosecutor also argued that the defense had not been diligent does not mean that he did not do his own part.

Defense counsel argued he had no obligation to re-subpoena witnesses once bench warrants had been issued and, addressing the court, asserted, "you told him to tell law enforcement to go pick the guy up." The following then took place:

"THE COURT: He said he contacted San Jose, he said that a couple weeks ago.

"[DEFENSE ATTORNEY]: Right. And so what progress have they made?

"[PROSECUTOR]: It's out of our jurisdiction, we cannot make another agency in another county go do something. I don't know where he thinks that we have this power, it's not this big conspiracy that all law enforcement is connected like that."

The prosecutor then again argued the defense had not been diligent in trying to contact the Sprinkles. Again, appellate counsel infers this means the prosecutor did nothing. Again, the record does not support the claim. Although the prosecutor was of the view that the issuance of the bench warrants did not relieve the defense of the obligation to re-subpoena or otherwise contact the Sprinkles when the trial date was continued, his comments do not mean he did not contact the San Jose Police Department about the warrants, as he represented that he had done.

The trial court asked defense counsel, "What can they do besides notify the police agency?" Defense counsel at first suggested that he wanted a record to be made of what, exactly, the prosecution had done. This was in aid of his theory that if Sprinkle were unavailable, the statements he had made to the police-statements that the trial court had already ruled were largely inadmissible-would become admissible. The trial court trailed the issue in order to call the jury back and continue with another witness.

At the lunch break, defense counsel stated that if the trial court found Sprinkle unavailable, "we need to talk about some of the statements that were made [by Sprinkle], and what my theories are" of their admissibility. He argued that the fact bench warrants had been issued showed the defense had been diligent. He reiterated that when his investigator had finally served Sprinkle with the subpoena, Sprinkle had said "that he was going to take his wife to North Dakota and we would never get him into court." Because a bench warrant then issued, "If we can't get him in then I think we

8

need to determine that he's unavailable and then consider what statements should be able to come in."

At the afternoon break, the trial court noted that the warrants were not in the record, but defense counsel explained he had appeared on September 20, 2007, before Judge Vlavianos, who issued the warrants after reviewing counsel's affidavit.

At the end of the day, the trial court stated it would review the transcript of Sprinkle's statement that evening, and the matter would be discussed the next day.

On February 28, 2008, after an in-chambers discussion, the trial court placed on the record its ruling: "I don't think there is one word of this statement that's admissible, Mr. [Defense Attorney]. I don't know what theory you were thinking about, but he denies any involvement with this homicide.... It's not under oath, it's just irrelevant." After some colloquy, the court stated: "There is no declaration against his interest, which is the only theory that's admissible for. I allowed the testimony of a few people about his Bronco and about his name. That already came out. This thing is not admissible under any theory as an exception to hearsay." After defense counsel made another lengthy argument, the trial court repeated: "Not one word of it is admissible."

The prosecutor noted that the trial court's ruling bypassed the unavailability question. Defense counsel did not refer to that issue and counsel did not press for a ruling from the court or for a record about the prosecutor's actions in trying to get the warrant served on Sprinkle. Therefore, appellate counsel's effort to fault the prosecutor for not making a record of what he did comes too late. (See People v. Braxton (2004) 34 Cal.4th 798, 813-814 [generally, failure to press for a ruling forfeits contention of error].)

On this record appellate counsel's claim that the prosecutor did something wrong lacks support. He was asked to notify the San Jose authorities about the bench warrants and did so. As he correctly stated, he lacked the power to force the San Jose police to do anything. Very possibly the out-of-county bench warrants-for $2,500-were viewed as a low priority, but that was not the fault of the prosecutor in this case.

Further, there was no dispute at trial that Sprinkle had vowed never to appear as a witness. Indeed, he had no natural motive to appear at a trial where he would be blamed for sodomizing and murdering a prostitute. Further, the trial court had excluded virtually all of the evidence about Sprinkle, and defendant has not challenged any evidentiary rulings on appeal.

The California Supreme Court has rejected similar claims of prosecutorial interference where the witnesses did not want to appear and where their proposed evidence was excluded: "Defendant's inability to present this evidence was not due to the witnesses' willingness or unwillingness to testify, but to the trial court's rulings excluding the evidence. Further, the record does not

9

establish that before the prosecution sent the fax to Illinois, either Walford or James [potential witnesses] had been willing to testify on defendant's behalf, or, if they were, that the prosecution's actions negatively influenced Walford or James or Dempsey in their decisions not to testify." (People v. Harris (2005) 37 Cal.4th 310, 344; see People v. DePriest (2007) 42 Cal .4th 1, 55-56.)

As stated in the facts, the jury heard testimony that Sprinkle was a parolee whose Bronco was seen the day after the murder near Wilson Way, and that his house and the Bronco were searched with no incriminating results, and the tread of his Bronco could not have made the impressions across the victim's body.

Appellate counsel provides a recitation of additional facts that supposedly would have been elicited had Sprinkle testified. Most of these facts were ruled inadmissible or are speculative or both.

For example, the trial court ruled that the fact a search warrant was issued based on apparent blood stains in the Bronco was inadmissible, because it was determined that the stains were not blood. Also excluded was evidence of a knife fight and prior crimes committed by Sprinkle. The trial court had tentatively ruled that Sprinkle could be asked to testify about slapping a prostitute and saying that if the police found blood in his Bronco, it was from prostitutes who were intravenous drug users. But the police did not find blood in his Bronco, and the fact he slapped a prostitute in the past does little, if anything, to tie him to this murder. Appellate counsel recites many other facts from Sprinkle's statement but, ultimately, that statement was excluded in its entirety by the trial court because Sprinkle had made no statements against penal interest. That ruling is not challenged in the briefing on appeal and we may not presume it was incorrect. (See People v. Mitchell (2008) 164 Cal.App.4th 442, 467 [failure to develop argument forfeits claim]; People v. Sanghera (2006) 139 Cal.App.4th 1567, 1573 [judgment presumed correct].) We cannot know how Sprinkle would have testified, but we cannot assume that he would have incriminated himself, absent some record of admissible incriminating statements he may have made.

Appellate counsel also cites to evidence tendered in support of the new trial motion. But that motion was denied, and because defendant does not argue that ruling was incorrect, the evidence may not be considered on appeal. (See Western Aggregates, Inc. v. County of Yuba (2002) 101 Cal.App.4th 278, 291.) Further, the two witnesses who testified at the new trial hearing-both of whom had convictions reflecting moral turpitude-would not have been available, had Sprinkle testified: One did not learn about the case until reading about the guilty verdict in the newspaper, and the defense investigator did not learn the whereabouts of the second until the first contacted him, again, after the trial was over.

Finally, appellate counsel claims there were "cracks and fissures in the proof of [defendant's] guilt that might well have caused the jury to reach a different verdict had Sprinkle testified." In reality, the People's case was very strong and the third party claim was very

>weak. Defendant's DNA was found in the victim's rectum, not Sprinkle's, and defendant's Blazer had tread marks consistent with the murderer's vehicle, not Sprinkle's Bronco. That the People's case was not perfect does not mean it was not solid.

People v. Nuccio, 2009 WL 3418503 at *2-7.

Petitioner alleges that the prosecutor violated his Sixth Amendment right to compulsory process by failing to assist in the execution of the bench warrant for Terry Sprinkle.

A criminal defendant has a well-recognized constitutional right to present a complete defense. Crane v. Kentucky, 476 U.S. 683, 690 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a 'meaningful opportunity to present a complete defense.'"). Necessary to the realization of this right is the ability to present evidence, including the testimony of witnesses. Washington v. Texas, 388 U.S. 14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.").

In the answer, respondent argues that there is no clearly established Supreme Court authority holding that a prosecutor violates a defendant's constitutional right to compulsory process by failing to assist in the execution of a bench warrant. For this reason, respondent argues that this claim should be denied.

In ascertaining what constitutes "clearly established Federal law," the court looks to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. Moreover, the Supreme Court decision must "'squarely address [ ] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

11

... recent decisions;" otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9h Cir.2009), quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008). If no clearly established Federal law exists, the inquiry is at an end and the court must defer to the state court's decision. See Carey v. Musladin, 549 U.S. 70, 76–77 (2006).

In support of the argument that there is no clearly established Supreme Court authority to support petitioner's claim, respondent cites several Supreme Court cases addressing defendants' rights to compulsory process. See Washington v. Texas, 388 U.S. 14, 23 (1967); Webb v. Texas, 409 U.S. 95, 97-98 (1972); Chambers v. Mississippi, 410 U.S. 284, 302 (1973); United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982); Pennsylvania v. Ritchie, 480 U.S. 39 (1987); Taylor v. Illinois, 484 U.S. 400 (1988). Respondent argues that these cases do not establish the principle that a prosecutor must assist in the execution of a bench warrant for a defense witness.

The undersigned agrees with respondent that no Supreme Court precedent exists directly addressing the issue of whether the prosecution must assist in the execution of a bench warrant for a defense witness. However, in Ritchie, supra, the Supreme Court held that criminal defendants have the right to government assistance in compelling the attendance of favorable witnesses. Ritchie, 480 U.S. at 56. This legal principle is applicable to petitioner's claim. However, for the following reasons, the undersigned finds no violation of this principle in petitioner's case.

The Ninth Circuit's discussion of Ritchie in U.S. v. Collins, 551 F.3d 914 (9th Cir. 2009), is instructive regarding the reach of the Supreme Court's holding in Ritchie:

> In Ritchie, and in the cases cited therein, the defendant was impeded from admitting favorable evidence because the government or the court took some action to block the defendant's attempts. See id. at 56-58, 107 S.Ct. 989 (due process required that trial court review in camera confidential report protected from disclosure by state law to determine if it was material to the defense); Cool v. United States, 409 U.S. 100, 102-03, 93 S.Ct. 354 (1972) (per curiam) (trial court violated defendant's Sixth Amendment right to present exculpatory testimony of accomplice-witness when it instructed the jury that they could credit testimony only if they were convinced it was true "beyond a reasonable doubt"); Webb v. Texas, 409 U.S. 95, 97-98, 93 S.Ct. 351 (1972) (per curiam) (trial court impermissibly singled out convict-witness

> by implying that it expected the witness to lie and threatening the witness with prosecution for perjury where witness then refused to testify); Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920 (1967) (state violated defendant's Sixth Amendment right of compulsory process by prohibiting defendant from admitting the testimony of an accomplice-witness).
>
> ****
>
> The similarity among all of these circumstances is that the government (or the court) is actively restraining or impeding the defendant from using a witness at trial.

551 F.3d at 926-27.

For the following reasons, the undersigned finds that there is no evidence that the prosecutor impeded petitioner's ability to call Terry Sprinkle as a witness. For clarity, the undersigned repeats some of the testimony cited in the opinion of the California Court of Appeal.

At the February 6, 2008 hearing, the trial court considered whether petitioner would be allowed to call Terry Sprinkle as a witness in support of his third party culpability defense. The trial court ruled that Sprinkle could testify regarding his statement that any blood in the back of his Bronco came from intravenous drug users and why he denied knowing the victim, who he went to high school with, after being shown a photograph of her. (RT at 92, 119, 121-22.) Defense counsel then asked, "What are we going to do about getting [Spinkle] here?" (Id. at 122.) The prosecutor responded, "That's not my problem." (Id.) The trial judge then stated, "That's not my -- I don't go subpoena witnesses." (Id.) Defense counsel then stated that there was a bench warrant out for Sprinkle's arrest. (Id.) The trial judge told defense counsel to give the information regarding where the Sprinkles were living, i.e., San Jose, to the prosecutor. (Id. at 122-23.)

> Prosecutor: You want me to call the San Jose police department?
>
> Court: No, the PD should.
>
> Proecutor: Well, we can notify them that there is a bench warrant out for their arrest. I think we do that.
>
> Court: Okay.
>
> Prosecutor: Again, that doesn't open any door of any bar fight.

1   Court:  No.

2   Prosecutor:  That stuff is not coming in.

3   Court:  No.

4   Prosecutor:  And then the domestic violence –

5   Defense Counsel:  What about the – have you ruled on the domestic violence as well, when he threatened to cut his wife's throat?

6   Court:  How is that connected to this?

7   Defense Counsel:  I think it's 1101(B) identity. I mean, here we have a guy –

9   Court:  If he slashed his wife's throat it would be, but a threat –

10  Defense Counsel:  Well, I don't have that, but I think that there is sufficient evidence that –

12  Court:  Give [the prosecutor] the evidence so he can contact the PD to contact – you say San Jose, what county is that, Santa Clara?

13  Prosecutor:  Yes.

14  Defense Counsel:  Yes.

15  Court:  Then contact Santa Clara Sheriff's office –

16  Defense Counsel:  I've given him the report.  I'll give it to him again so we can, you know, get him in.

18  (Id. at 123-24.)

19       On February 27, 2008, defense counsel observed that the prosecution was coming to the

20  close of its case and inquired as to what progress had been made in locating Sprinkle.  (Id. at

21  703.)  The court then asked the prosecutor if he had heard anything.  (Id. at 704.)

22  Prosecutor:  I have not heard anything, that would be the San Jose Police Department.  Further, they have not been subpoenaed for this
23  trial, this trial has been reset many, many times, there was a reset I believe in January or December that that was issued.  I believe
24  they're still in their homes, I think that the Defense should actually go down there and subpoena them to Court and see if they'll come
25  now.

26  Defense Counsel:  There are bench warrants for their arrest.

27  Prosecutor:  But they've never been subpoenaed for this jury trial assignment.

28

14

> Defense Counsel: They were subpoened, they never showed up, there was a bench warrant. The bench warrant, the law enforcement should enforce the bench warrant, it's a subpoena served in this case.
>
> Prosecutor: And, Your Honor, I believe Mr. Sprinkle's still probably at the same home, no one knows, the Defense hasn't used their investigator to try and go and try and to subpoena him again.
>
> Court: Have you had two weeks to try and find him?
>
> Defense Counsel: No, because the last time we discussed it I told you there was a bench warrant, you told him to tell law enforcement to go pick the guy up.
>
> Court: He said he contacted San Jose, he said that a couple weeks ago.
>
> Defense Counsel: Right. And so what progress have they made?
>
> Prosecutor: It's out of our jurisdiction, we cannot make another agency in another county go do something. I don't know where he thinks that we have this power, it's not this big conspiracy that all law enforcement is connected like that.
>
> ***
>
> Court: What can they do besides notify the police agency?
>
> Defense Counsel: Well, I think at some point in time we need to establish what, if any, efforts were made to contact these people based upon the bench warrants that this Court issued, and if they've made efforts and they were unable to locate the individual, then we need to make a determination as to whether or not the witness is unavailable because of the efforts that have been made, and then we need to consider what statements can come in through hearsay exceptions for a witness who is unavailable.

(Id. at 704-06.)

After further discussion, the trial court asked defense counsel what prior testimony of Sprinkle he had. (Id. at 709.) Defense counsel stated that Sprinkle did not testify at the preliminary hearing but he had a recorded statement taken the day after the victim was found. (Id.)

On February 28, 2008, after reviewing Sprinkle's statement, the trial court ruled that none of Sprinkle's prior statement was admissible. (Id. at 786.)

The circumstances of this case do not show that the prosecutor impeded petitioner's ability to bring Sprinkle to court as a witness. While it is not likely that the prosecutor would

15

1  have been required to contact the San Jose law enforcement authorities under the holding of
2  Ritchie, the undersigned agrees with the California Court of Appeal's interpretation of the record
3  that the prosecutor did make this contact after the February 6, 2008 hearing.  The undersigned
4  also observes that the prosecutor did not have the authority to personally execute the bench
5  warrant and arrest Sprinkle.

6  In his reply brief filed in the California Court of Appeal, petitioner argued that he had to
7  rely on the prosecution to execute the bench warrant, because only a law enforcement officer was
8  authorized to execute the warrant under state law.  (Respondent's Lodged Document 5 at 9.)  The
9  undersigned acknowledges the difficulty posed to petitioner's defense in having the bench
10 warrant executed in a jurisdiction other than the one where the trial occurred.  However, the
11 undersigned cannot find any clearly established Supreme Court authority establishing that the
12 prosecutor was required to have taken any additional action.

13 Even assuming that the prosecutor somehow impeded petitioner's ability to call Sprinkle
14 as a witness by failing to take further steps to have the bench warrant executed, petitioner is still
15 not entitled to relief as to this claim.  A violation of the Compulsory Process Clause of the Sixth
16 Amendment "requires some showing that the evidence lost would be both material and favorable
17 to the defense."  United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982).  "'[I]mplicit in
18 the requirement of materiality is a concern that the suppressed evidence might have affected the
19 outcome of the trial.'"  Id. at 868 (quoting United States v. Agurs, 427 U.S. 97, 104 (1976)).  For
20 the following reasons, the undersigned finds that Sprinkle's proposed testimony would not have
21 affected the outcome of the trial.

22 Adding Sprinkle's proposed testimony to the evidence the jury heard regarding Sprinkle
23 would not have strengthened petitioner's third party culpability defense.  As noted by the
24 California Court of Appeal, an eyewitness testified that she saw the victim get into a vehicle that
25 she described as a white Bronco with tinted windows.  The jury also heard evidence that the day
26 after the murder, a peace officer saw a Ford Bronco in the Wilson Way area, and it was registered
27 to Terry Sprinkle, a parolee.  Sprinkle's house and Bronco were searched, but nothing was found.
28 In addition, a criminalist testified that Sprinkle's Bronco could not have made the tread marks

1  found at the crime scene.

2        As discussed above, at the February 6, 2008 hearing, the trial court ruled that Sprinkle

3  could testify regarding his statement that he did not know the victim although they went to high

4  school together and his explanations for the potential presence of blood in his Bronco (although

5  none was found).  During a hearing, the prosecutor offered a reasonable explanation as to why

6  Sprinkle failed to identify the victim:

> Knowing the victim, he denied it.  At the time of her death, when the officers spoke to him, her name was Jody Zunino. He knew a Jody Anderson from high school.  The photos, they never showed him a high school photo, which included her driver's license which said Jody Zunino, and this is 24 years after the earliest they possibly could have been in high school together.  You know, the fact that he doesn't recognize a photo and he does after that happens, and when the defense actually interviews Mr. Sprinkle, yeah, you know, I didn't know it, and he explains why.  Her name wasn't Zunino, it was Anderson, and I remember Anderson because the father was cop and I remember that.

13  (RT at 92.)

14        In contrast to the evidence against Sprinkle, the jury heard evidence that petitioner's

15  semen was found in the victim's rectum and the tire tracks found at the murder sight were

16  consistent with his vehicle's tire tracks.  No physical evidence linked Sprinkle to the crime and

17  the tire tracks found at the murder sight were not consistent with his vehicle's tire tracks.

18  Considering the strength of the evidence against petitioner and the weakness of the evidence

19  linking Sprinkle to the murder, evidence that Sprinkle initially did not identify the victim and

20  offered a different explanation as to why there may have been blood in his Bronco, would not

21  have changed the outcome of the case.  While there is no evidence regarding how Sprinkle would

22  have explained these statements, the undersigned agrees with the California Court of Appeal that

23  any explanation by Sprinkle for these statements would not have implicated him in the crime.

24        For the reasons discussed above, the undersigned finds that the denial of this claim by the

25  California Court of Appeal was not an unreasonable application of clearly established Supreme

26  Court authority.  Accordingly, this claim should be denied.

27  ////

28  ////

17

*Alleged Trial Court Interference*

Petitioner argues that the trial court violated his Sixth Amendment to compulsory process by failing to enforce the bench warrant for Sprinkle's arrest. Petitioner did not raise this claim in his opening brief filed in the California Court of Appeal. (Respondent's Lodged Document 3.) In his reply brief, petitioner argued that the trial court should have enforced his right to compulsory process. (Respondent's Lodged Document 5 at 9-12.)

In his petition for rehearing filed in the California Court of Appeal, petitioner requested that the California Court of Appeal address this additional issue, which was not addressed in the state appellate court's reasoned decision affirming his conviction. (Respondent's Lodged Document 7 at 10.) The California Court of Appeal denied the petition for rehearing without comment or citation. (Id.) Petitioner raised this new issue in his petition for review, which the California Supreme Court denied without comment or citation. (Respondent's Lodged Document 8.) Because there is no reasoned opinion addressing this claim, the undersigned independently reviews the record to determine whether the denial of this claim by the California Supreme Court was objectively unreasonable. Haney v. Adams, 641 F.3d 1168, 1171 (9th Cir. 2011).

The Supreme Court's standard discussed in Ritchie for evaluating claims alleging violations of the Compulsory Process Clause by the prosecution is equally applicable to claims alleging violation of this Clause by a trial court. See U.S. v. Collins, 551 F.3d at 926-27. Accordingly, the undersigned considers whether the trial court impeded or interfered with petitioner's ability to call Sprinkle as a witness.

The record demonstrates that the trial court neither impeded nor interfered with petitioner's ability to call Sprinkle as a witness. The trial court issued a bench warrant for Sprinkle to appear. While petitioner suggests that the trial court should have done more toward having the bench warrant executed, the undersigned cannot find any Supreme Court authority supporting this proposition. Moreover, even assuming the Constitution required the trial court to have done more, for the reasons discussed above, the undersigned finds that petitioner has not demonstrated that Sprinkle's testimony would have changed the outcome of the trial.

////

The denial of this claim by the California Supreme Court was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: November 8, 2013

nuc2652.157

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE